## Douglas Company, Defendant in Error, v. Southern Railway, Plaintiff in Error.

### Gen. No. 24,911.

1. COMMERCE, § 4*—*when shipments of goods constitute interstate commerce.* When a shipper forwards goods from one State to a certain distributing point in another State, with the intent of thence forwarding them to some one or several of its customers, to whom it has traveling salesmen selling its goods, located at other different points in the same State as the distributing point, and thence forwards the shipments to such points, the said shipment or shipments are in interstate commerce during the entire transit from the point of origin to final destination, and the mere fact that the shipper did not know at the time the shipment originated which particular customer would eventually receive any particular part of a shipment or any particular portion of the goods would make no difference.

2. COMMERCE, § 4*—*what determines character of shipment as interstate or intrastate commerce.* The ultimate destination of the shipment determines its character as interstate or intrastate commerce.

3. COMMERCE, § 4*—*interstate character of shipment as not terminated by its arrival at intermediate point from which new bills of lading are issued.* The interstate character of a shipment is not terminated by its arrival at an intermediate point from which new bills of lading are issued to the points of final destination, such points being directed by the shipper.

4. COMMERCE, § 4*—*what determines whether shipment is interstate.* The essential nature of the movement, not the character of the bill of lading, determines whether or not the shipment is interstate.

5. COMMERCE, § 4*—*how long interstate character of shipment lasts.* When a shipment has once become interstate commerce, that character attaches to it until it reaches its final destination.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Douglas Company v. Southern Railway, 216 Ill. App. 148.

6. COMMERCE, § 4*—*how change of character of shipment from interstate to intrastate effected.* To establish an intrastate character in a shipment interstate in its inception, there must be actual, good-faith delivery of the shipment to the consignee and actually a new and independent shipment by such consignee to the ultimate destination, while the article is physically present and in the consignee's possession, and such change in character is not effected by the existence of an original and continuing intention to so reship in intrastate commerce for the saving of expense.

Error to the Municipal Court of Chicago; the Hon. JOHN COURTNEY, Judge, presiding. Heard in this court at the March term, 1919. Reversed with judgment of *nil capiat* and for costs. Opinion filed December 8, 1919.

POMEROY & MARTIN, for plaintiff in error; CLAUDIAN B. NORTHROP, of counsel.

GALLAGHER, KOHLSAAT & RINAKER, for defendant in error; E. B. WILKINSON, of counsel.

MR. JUSTICE HOLDOM delivered the opinion of the court.

In the trial court plaintiff had judgment for $514.29 on a finding of the trial judge to whom the cause was submitted on a stipulation of fact, and defendant brings the record to this court for review on a writ of error.

The crucial question, on the decision of which the result of this cause must rest, is: Were the shipments of the freight in controversy shipments in intrastate or interstate commerce?

There is no dispute regarding the facts which were stipulated into the record and which in brief are, that plaintiff is a corporation resident at Cedar Rapids, Iowa, and manufactures and ships starch; that defendant is a railroad corporation existing under the laws of Virginia and operates a system of railroads between and in certain States, including, among others, South Carolina; that during the preceding 5 years it had on

file its interstate tariffs with the Interstate Commerce Commission and intrastate tariffs with the several railroad commissions of the States in which it operates, including South Carolina, which tariffs show the schedules of charges upon its lines, as well as charges in connection with traffic passing over its lines and other railroads and steamship lines; that plaintiff from 1913 to 1916 employed traveling salesmen to sell its products to cotton mills located in Virginia, North Carolina, South Carolina and Georgia, to whom they sold starch to be delivered at their mills and who forwarded the orders so taken to plaintiff at Cedar Rapids; that in the conduct of its business plaintiff, to make as early deliveries as possible to its customers, adopted a course of business, which was followed at the time the shipments involved in this cause were made, whereby from time to time it shipped from its plant at Cedar Rapids a large number of carloads of starch by rail to Baltimore, thence by steamship to Charleston to its agent, J. F. Leonard, as consignee, the freight to Charleston in each instance being paid by plaintiff, and where the shipments were unloaded on the docks of the steamship company and placed in its warehouse on its said docks, 180 bags of the shipments involved in this suit being delivered to F. W. Wagner, a wholesale grocer in Charleston; all other shipments were transferred at Charleston from the warehouse and docks into railroad cars and shipped under instructions to plaintiff to the several cotton mills where the starch had been sold and where it was ultimately consumed, the freight from Charleston to the final destination being paid by plaintiff; that upon the arrival of the shipments at Charleston plaintiff sometimes immediately reloaded them into railroad cars and sometimes left them at the dock for the free time allowed by the tariff of the steamship company, and sometimes for periods of time longer than the free time, in which latter case the usual storage charges provided by the tariff of the steamship company were

paid by plaintiff. The shipments were thereafter loaded by plaintiff into cars and delivered to its customers, who operated cotton mills, where the starch was used, and that for each separate shipment from Charleston to these cotton mills a new bill of lading was taken out for plaintiff or its agent; that plaintiff's customers paid plaintiff direct at Cedar Rapids for the starch upon receipt of the shipments; that the shipments from Cedar Rapids to Charleston were in minimum car lots of 200 bags, minimum weight 42,000 pounds; that the shipments from Charleston to plaintiff's customers ranged from five to fifty bags of 280 pounds each; that when in car lots the total weight was 30,000 pounds or more; that when the shipments left Cedar Rapids it was not known to whom any particular shipment would go; that plaintiff knew that such shipments would not permanently remain in Charleston except such starch as might be sold to F. W. Wagner, a wholesale grocer in Charleston, and that all the shipments would first go to Charleston and be there disposed of as above recited, and from thence shipped to cotton mills in South Carolina and other States where the starch would be ultimately used pursuant to orders taken by plaintiff's traveling salesman; that during all the time covered by the shipments involved in this suit defendant had filed with the Interstate Commerce Commission tariff rates applicable to interstate shipments from Charleston to the several destinations of the shipments of the starch involved in this suit, and also had on file with the Railroad Commission of South Carolina the tariff rates applicable to intrastate shipments from Charleston to the several destinations of the shipments involved in this suit; that a dispute arose between the parties as to whether the shipments here in dispute, so far as their movements between Charleston and the several cotton mills within the State of South Carolina were concerned, should be governed by interstate or intrastate tariff; that defendant insisted upon and collected at the interstate tariff rate,

which was higher than the intrastate rate, and that the question of what tariff should be applied depends entirely upon whether or not the several shipments from Charleston to the cotton mills in South Carolina were interstate or intrastate shipments; and if the court finds that the shipments in question were interstate shipments, then the finding should be for the defendant; and if the court finds that such shipments were intrastate shipments, then the finding should be for plaintiff for the amount of the overcharge agreed to be the amount of the judgment in the record.

The defendant tendered the following as a proposition of law to be held by the trial judge, which he refused:

"4. The court holds as a proposition of law that when a shipper forwards goods from one State to a certain distributing point in another State, with the intent of thence forwarding them to some one or several of its customers to whom it has traveling salesmen selling its goods located at other different points in the same State as the said distributing point, and thence forwards such shipments to said points, then the said shipment or shipments are in interstate commerce during the entire transit from the point of origin to final destination, and the mere fact that the shipper did not know at the time the shipment originated which particular customer would eventually receive any particular part of a shipment or any particular portion of the goods would make no difference."

If this states, as we think it does, a correct principle of law based upon the agreed facts in this case, then the judgment of the Municipal Court must be reversed.

From the stipulation of facts it is clear, we think, that all the earmarks of interstate shipment as uniformly held in the federal decisions are here present.

The transactions in evidence cover a period of more than 4 years and during all this time and in every case the starch, the subject of the several shipments, was owned by plaintiff, 98 per cent of which were transshipped at Charleston, and in fact all shipments were

transshipped with the exception of 180 bags—less than one car—sold to F. W. Wagner, a wholesale grocer at Charleston. These shipments, except the Wagner sale, were in contemplation of law in transit until the ultimate destination was reached and the cotton-mill owners who had made purchases thereof through salesmen of plaintiff had received their shipments; not until final delivery to the cotton-mill owners did the title of plaintiff become divested, and not until that time had the shipments ceased to be in course of transit from plaintiff at Cedar Rapids to the purchasers at the ultimate destinations at the several points in South Carolina, exclusive of Charleston. The delivery to Leonard, the agent at Charleston, was not the ultimate delivery intended at the time plaintiff made the initial shipments at Cedar Rapids. These shipments were all by rail to Baltimore, Maryland, thence by water route to Charleston, where, with the exception of the Wagner shipment, three courses were pursued. Some were transferred from steamship and reloaded upon railroad cars to ultimate destinations to purchasers in various parts of South Carolina; some were stored in the warehouse of the steamship company, and some were left on the steamship company's docks during the free time allowed by the tariff of the steamship company and sometimes for a period longer than the free time. All of these shipments were thereafter loaded into cars for the plaintiff and delivered to its cotton-mill customers at various points in South Carolina. All freight charges were paid by plaintiff, as also the warehouse charges, and the several shipments were paid for to the plaintiff at Cedar Rapids by the several cotton-mill purchasers upon their receipt, so that from the time the shipments left Cedar Rapids and during all the time of their transportation both by land and water, including their storage upon the dock of the steamship company and in the warehouse of the steamship company and until their arrival at their ultimate destinations to the cotton-mill purchasers, plaintiff was

the owner; and during these several states of carriage they were in course of transportation in commerce between the States and were consequently interstate shipments, as the ultimate destination determines the character of the commerce. (*Peoria & P. U. Ry. Co. v. Corning & Co.*, 266 Ill. 515.) Charleston was the point of disembarkment from the water part of the route for reloading on cars to the places of ultimate destination. Plaintiff maintained no place of business in Charleston, nor did it have any warehouse there. None of its starch was either used or sold there. Orders from customers through traveling salesmen were sent direct to plaintiff at Cedar Rapids, and instructions were sent from there to Charleston regarding the continuation of the shipments from Charleston to the several cotton-mill purchasers.

The case under discussion is analogous to that of *Swift & Co. v. United States*, 196 U. S. 375, the distinctive features being that in this case we are dealing with starch, while in the *Swift* case the court was dealing with cattle, and the court says:

"When cattle are sent for sale from a place in one State, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the States, and the purchase of the cattle is a part and incident of such commerce. What we say is true at least of such a purchase by residence in another State from that of the seller and of the cattle."

Plaintiff contends that the interstate character of the shipments ceased on the arrival of the several shipments at Charleston, where new bills of lading were issued to points of final destination, destinations directed by plaintiff from its place of business at Cedar Rapids. What the court said in *Illinois Cent. R. Co. v. DeFuentes*, 236 U. S. 157, is, we think, a sufficient answer to this contention; it said, *inter alia:*

"The contention for appellees that switching cars at junctions and terminals 'is only interstate commerce when performed as a part of the interstate movement on a through rate or bill of lading under tariff authority' is contrary to the doctrine established by opinions of this court in the cases cited above"—which were *McNeill v. Southern R. Co.,* 202 U. S. 543; *Southern Pac. Terminal Co. v. Interstate Commerce Commission,* 219 U. S. 498; *Ohio R. Commission v. Worthington,* 225 U. S. 101; *Texas & N. O. R. Co. v. Sabine Tram Co.,* 227 U. S. 111; *Louisiana R. Commission v. Texas & P. R. Co.,* 229 U. S. 336.

The essential nature of the movement, and not the form of the bill of lading, determined the character of the commerce involved. When the character of interstate commerce has once been acquired it continues until the load reaches the ultimate point of destination intended, which does not necessarily depend upon the form of the bill of lading or whether there has been a transshipment en route with a new bill of lading for the balance of the journey. As said in *Southern Pac. Terminal Co. v. Interstate Commerce Commission,* 219 U. S. 498:

"To hold otherwise would be to disregard, as the Commission said, the substance of things, and make evasions of the act of Congress quite easy. It makes no difference, therefore, that the shipments of the products were not made on through bills of lading, or whether their initial point was Galveston or some other place in Texas. They were all destined for export, and by their delivery to the Galveston, Harrisburg & San Antonio Railway they must be considered as having been delivered to a carrier for transportation to their foreign destination, the terminal company being a part of the railway for such purpose.

"The case, therefore, comes under *Coe v. Errol,* 116 U. S. 517, where it is said that goods are in interstate and necessarily as well in foreign, commerce when they have 'actually started in the course of transportation to another State or been delivered to a carrier for

transportation.' '' *Ohio R. Commission v. Worthington,* 225 U. S. 101; *Atchison, T. & S. F. R. Co.·v. Harold,* 241 U. S. 371.

In the *Harold* case, *supra,* a carload of grain was shipped from Yanks, Nebraska, consigned to Topeka, Kansas, with directions to notify the Santa Fe for shipment and then forward to Elk Falls, Kansas. This was held to be an interstate shipment. *Western Oil Refining Co. v. Lipscomb,* 244 U. S. 346.

Plaintiff relies, in support of its contentions, upon the cases of *Gulf, C. & S. F. R. Co. v. Texas,* 204 U S. 403; *Chicago, M. & St. P. Ry. Co. v. State of Iowa,* 233 U. S. 334, and kindred cases.

These cases are not in point, because the controlling features in the instant case are lacking in the cases *supra.* There is not present in any of these cases continued ownership by the consignor to the point of ultimate destination, neither was there such ownership at the time the journey was interrupted for the purpose of reshipment to ultimate destination. *Chicago, M. & St. P. Ry. Co. v. State of Iowa, supra,* was a case where a shipment of coal was made from Illinois to Davenport, Iowa, to a consignee at Davenport, the certainty in regard to which shipment ended at Davenport. Further shipment, if any, was to be determined after the arrival of the coal at Davenport by the consignee there. On this point the court said:

"The coal was under the control of the consignee, and he could sell it in transit or at Davenport or reconsign it to a point on respondent's railway, or any other railway, at his own discretion."

And the court further said:

"The Supreme Court of the State took the same view of the facts that the Commission had taken and accordingly held that the shipments were intrastate. The court said that the facts showed that the coal was originally consigned to the coal company in Davenport, that it was there held until sales were made, that the consignee had taken delivery, paying the freight to the initial carrier and assuming full control."

These facts are so variant from those in the case before us as to make the Davenport case 'inapplicable.

In *Gulf, C. & S. F. R. Co. v. Texas, supra,* the reshipment from Texarkana, Texas, to Goldthwaite, Texas, was on the order of a consignee. This destroyed the interstate character of the shipment so far as its rerouting from Texarkana to Goldthwaite, Texas, was concerned and in this regard is not comparable to the facts in the instant case.

In order to establish an intrastate shipment in a shipment in its inception interstate, there must be, as held in *Settle v. Baltimore & O. S. W. R. Co.,* 249 Fed. 913, as the ultimate test, actual good-faith delivery of the shipment to the consignee and actually a new and independent shipment by such consignee to the ultimate destination, while the article is physically present and in the possession of such consignee, and as said in case, *supra,* "that the effect of such good-faith delivery, possession and independent reshipment is not, as a mere matter of law, converted into an interstate shipment by the existence of an original and continuing intention to so reship in intrastate commerce for the saving of expense." So in the case under discussion, if the shipments in dispute had been to a consignee at Charleston, then the reshipment within the State by such consignee would be an intrastate shipment. However in this case the starch was at all times owned by plaintiff, as much so at Charleston as at Cedar Rapids at the time of reshipment to ultimate destinations to the cotton-mill purchasers, and as such ownership continued until the points of ultimate destination were reached. These are the essential elements which stamp the shipments as interstate commerce from the point of departure in Cedar Rapids to the arrival at the ultimate destinations in South Carolina.

For the foregoing reasons and under the authorities cited, we hold that it was error for the court not to hold proposition 4 above recited as the law of the case,

and likewise erred in finding that the shipments were in intrastate and in not finding that they were in interstate commerce. For these reasons the judgment of the Municipal Court is reversed, and as there can be no recovery under the stipulation of facts in the record, a judgment of *nil capiat* and for costs is entered in this court.

*Reversed with judgment of nil capiat and for costs.*